# EXHIBIT 3

## CONTRIBUTION AND REDEMPTION AGREEMENT

THIS CONTRIBUTION AND REDEMPTION AGREEMENT (this **"Agreement"**) is dated this 31st day of March, 2009 (the **"Effective Date"**), and is entered into by and among **OLD ORCHARD EQUITY CORP.**, a Delaware corporation (**"Seller"**), **ALLIED CAPITAL CORPORATION**, a Maryland corporation (**"Allied"**), **OLD ORCHARD BRANDS LLC**, a Michigan limited liability company (the **"Company"**), **MARK R. SAUR, TRUSTEE OF THE MARK R. SAUR TRUST**, dated July 6, 1992, as amended, and **LISA M. SAUR, TRUSTEE OF THE LISA M. SAUR TRUST**, dated July 6, 1992 (collectively, the **"Trusts"**), **APPLE VALLEY HOLDINGS, INC.**, a Michigan corporation (**"AVH"**), **HILLSBORO ASSOCIATES, L.L.C.**, a Michigan limited liability company (**"Hillsboro"**), **HOWARD VELTMAN**, a Michigan resident (**"Veltman"**), and **CHARLENE VREDEVELT**, a Michigan resident (**"Vredevelt"** and collectively with the Trusts, Hillsboro and Veltman, the **"Buyers"**).

### RECITALS:

A.      The Company has outstanding 38.767 Units constituting membership interests in the Company (the **"Company Units"**), and Seller owns 26.3679 of such Company Units.

B.      The Company is engaged in the business of manufacturing juice products, including, without limitation, ready-to-drink juice and frozen concentrate juice (the **"Business"**).

C.      Buyers desire to make capital contributions to the Company at Closing in exchange for certain Company Units.

D.      Seller and the Company intend for the Company to redeem from Seller all of the Company Units held by Seller at Closing for consideration consisting of cash.

E.      Capitalized terms and phrases used in this Agreement shall have the meanings set forth in Section 8.1.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### CONTRIBUTION AND REDEMPTION

1.1      **Buyers' Contributions.**  At the Closing, subject to the terms and conditions contained in this Agreement, each Buyer will make a capital contribution to the Company in the amount set forth next to its name on **Schedule 1.1** (the **"Buyer Capital Contribution"**), and the Company will issue to each Buyer in exchange therefor the Company Units specified on **Schedule 1.1** (the **"Buyer Company Units"**).

1.2      **Redemption of Redeemed Company Units**.  At the Closing, subject to the terms and conditions contained in this Agreement, Seller agrees to surrender, sell, transfer, assign and

deliver to the Company, free and clear of all Liens, and the Company agrees to redeem from Seller, all of the Company Units held by Seller (the **"Redeemed Company Units"**).

1.3 **Enterprise Value.** The sum of (a) through (d) below shall be the **"Enterprise Value"** of the Company:

(a) the Estimated Enterprise Value; plus or minus (as applicable)

(b) any True-Up Working Capital Excess or any True-Up Working Capital Deficit; plus or minus (as applicable)

(c) any True-Up Cash Excess or any True-Up Cash Deficit; plus or minus (as applicable)

(d) any True-Up Pre-Closing Tax Excess or any True-Up Pre-Closing Tax Deficit.

The amount equal to 2.5795% of the sum of the Enterprise Value is hereinafter referred to as the **"Final Company Unit Value."**

1.4 **Payments to Seller; Other Closing Payments.**

(a) The sum of the amounts described in subsections 1.4(a)(i) through 1.4(a)(iv) below shall be the **"Estimated Enterprise Value"** of the Company:

(i) $55,000,000, less (y) the aggregate amount of payments to be made by the Company pursuant to Section 1.4(c) less (z) $444,597.63, being the principal amount of any Ongoing Capital Leases; plus

(ii) $40,000, being the Estimated Pre-Closing Tax Payment Excess; plus

(iii) $250,000 being the Estimated Working Capital Excess; plus

(iv) $7,300,000, being the Estimated Company Cash, as set forth in the Estimated Calculation.

(b) At the Closing, the Company shall pay to Seller an aggregate amount equal to Seller's Pro Rata Percentage of the Estimated Enterprise Value.

(c) At the Closing, the Company shall make the following payments:

(i) the Company shall pay to each holder of Indebtedness of the Company listed in the Subordinated Debt Pay-Off Certificate and the General Pay-Off Certificate the amounts specified in the Subordinated Debt Pay-Off Certificate and the General Pay-Off Certificate as being owed by the Company to such holder; provided, however, that the Company shall not payoff capital leases in effect at the Closing (such capital leases being referred to herein as the **"Ongoing Capital Leases"**) as to which the principal portion of the Company's payment obligations under such Ongoing Capital Leases will be deducted in the calculation of the Estimated Enterprise Value as provided in Section 1.4(a)(i);

2

(ii) the Company shall pay to the Company Professional Advisor the amount specified in the Fee Certification as being owed by the Company to the Company Professional Advisor;

(iii) the Company shall pay to AC Corp the Accrued Management Fee as specified in the Management Fee Certificate; and

(iv) the Company shall pay to the appropriate party the Other Company Fees and Expenses as specified in the Allied Fee and Expense Certificate and the Company Fee and Expense Certificate.

1.5 **Payment Terms.** All payments made pursuant to this Agreement, or any other agreement, instrument, notice or other document required to be delivered pursuant to this Agreement (collectively, with this Agreement, the **"Transaction Documents"**), shall be made by wire transfer of immediately available funds to the account or accounts specified in writing by the payee at or prior to the Closing, other than as provided in Section 1.4(c) and except to the extent otherwise provided in any such Transaction Document. All references herein to amounts of money are references to United States Dollars.

1.6 **Working Capital, Cash and Unpaid Pre-Closing Tax Liability Adjustments to Redemption Price.**

(a) Prior to or on the Closing Date, the Company (in consultation with the Buyers and the Seller) shall prepare a good faith written estimate, with reasonable detail and supporting documentation (the **"Estimated Calculation"**), of the Working Capital of the Company as of the Closing Date (the **"Estimated Working Capital"**), of the amount of all of the Company's estimated Cash at the Closing before any payment of the Buyers' expenses and without taking into account the Buyer Capital Contributions (the **"Estimated Company Cash"**), and of the Company's estimated amount of liabilities for state income Taxes of the Company for all taxable periods ending in the calendar year 2009 and on or before the Closing Date (**"Estimated Pre-Closing Tax Liability"**) and of any Estimated Pre-Closing Tax Payment Excess, and deliver such Estimated Calculation of the Estimated Working Capital, the Estimated Company Cash, the Estimated Pre-Closing Tax Liability and the Estimated Pre-Closing Tax Excess to the Buyers and the Seller prior to or on the Closing Date. The Buyer Capital Contributions shall be ignored and not taken into account in the Estimated Calculation and the Calculation.

(b) Buyers shall cause the Company, within ninety (90) days after the Closing Date, to prepare and deliver to the Seller a calculation, with reasonable detail and supporting documentation (the **"Calculation"**), of (i) the Working Capital of the Company as of the Closing Date (the **"Actual Working Capital"**); (ii) the amount of the Company's Cash at the Closing before any payment of the Buyers' expenses and without taking into account the Buyer Capital Contributions (the **"Actual Company Cash"**), and (iii) the amount of the Company's Pre-Closing Tax Liability as of the Closing Date (the **"Actual Pre-Closing Tax Liability"**), in each case in a manner consistent with the terms of this Agreement. Unless the Seller delivers to the Company a written notice of objection(s) (**"Notice of Objection"**) to the Calculation setting forth items of objection (**"Items of Objection"**) within thirty (30) days after the Seller's receipt thereof, the Calculation delivered by the Company to the Seller shall be conclusive, final and binding on the parties. If the Seller delivers a Notice of Objection to the Calculation within such thirty (30) day period, all portions of the Calculation other than the portions subject to the Items of Objection shall be conclusive, final and binding on the parties, and the Company and the

3

Seller shall attempt to resolve the Items of Objection and to agree in writing upon a final Calculation of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability. If the Company and the Seller have not so agreed in writing within thirty (30) days after the Company's receipt of the Notice of Objection, the parties shall retain Deloitte LLP ("**Auditor**") to resolve the Items of Objection and to prepare a final Calculation of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability, in each case, to the extent applicable, in a manner consistent with the terms of this Agreement. Within ten (10) days after retaining the Auditor, (a) the Company and the Seller shall furnish the Auditor with a copy of this Agreement, the appropriate financial statements of the Company, the Calculation of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability prepared by the Company, the Notice of Objection and any other relevant correspondence between the Company and the Seller, and (b) the Company and the Seller will provide to the Auditor and to each other a copy of a written submission setting forth their respective positions with respect to each remaining Item of Objection described in the Notice of Objection. Upon reasonable notice and during normal business hours, the Company shall, and the Buyers shall cause the Company to, give the Auditor and the Seller (and their representatives and advisors) access to the books and records of the Company. The Auditor shall act as an arbitrator to determine, based solely on such presentations by the Company and Seller (and not by independent review) only those remaining Items of Objection described in the Notice of Objection. In resolving any Item of Objection, the Auditor shall not assign a value to any item greater than the greatest value or less than the smallest value for such item claimed by any party. The fees and expenses of the Auditor shall be borne by the Seller, on the one hand, and the Company, on the other hand, in proportion to the amount by which their respective determinations of the Actual Working Capital differ from the amount determined by the Auditor, which proportionate allocations shall also be determined by the Auditor at the time the determination of the Auditor is rendered regarding the Items of Objection and the final Calculation. The Auditor shall render its decision regarding the Items of Objection and the final Calculation of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability within sixty (60) days after the date on which it is retained by the parties, and when it renders its decision, the Auditor shall deliver to the Company and the Seller (i) a written Calculation of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability, (ii) a report setting forth each Item of Objection and the Auditor's determination with respect thereto and (iii) a determination of the percentage of its fees and expenses that shall be borne by each party. The Auditor's determination shall be non-appealable, conclusive, final and binding upon the parties (absent manifest errors) and may be entered and enforced in any court of competent jurisdiction.

(c)     Subject to Section 1.7, upon the final determination of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability (by the failure of the Seller to deliver a Notice of Objection, by written agreement of the Company and the Seller or by determination of the Auditor):

(i)     If there is a True-Up Working Capital Deficit, Seller shall pay to the Company its Pro Rata Percentage of the True-Up Working Capital Deficit.

(ii)     If there is a True-Up Working Capital Excess, then the Company shall pay to Seller its Pro Rata Percentage of the True-Up Working Capital Excess.

(iii)     If the Actual Company Cash exceeds the Estimated Company Cash ("**True-Up Cash Excess**"), the Company shall pay to Seller its Pro Rata Percentage of such

True-Up Cash Excess; if the Actual Company Cash is less than the Estimated Company Cash ("**True-Up Cash Deficit**"), Seller shall pay to the Company its Pro Rata Percentage of the True-Up Cash Deficit.

(iv)     If the Actual Pre-Closing Tax Liability is greater than the Estimated Pre-Closing Tax Liability ("**True-Up Pre-Closing Tax Deficit**"), Seller shall pay to the Company its Pro Rata Percentage of the True-Up Pre-Closing Tax Deficit. If the Actual Pre-Closing Tax Liability is less than the Estimated Pre-Closing Tax Liability (a "**True-Up Pre-Closing Tax Excess**"), the Company shall pay to Seller its Pro Rata Percentage of such True-Up Pre-Closing Tax Excess.

Subject to Section 1.7, any amount payable pursuant to this Section 1.6 shall be paid by the applicable party(ies) in cash, by wire transfer, within three (3) business days following the final determination of the Actual Working Capital, the Actual Company Cash and the Actual Pre-Closing Tax Liability. Any amount payable pursuant to this Section 1.6 shall be paid with interest from the Closing Date to the date of payment at a rate of interest equal to the Prime Rate in effect on the Effective Date.

If the Final Company Unit Value exceeds the amount per Company Unit that the Buyers paid for their Company Units issued at the Closing, then each Buyer shall make an additional capital contribution to the Company in an amount equal to the product of such excess and the number of Company Units issued to such Buyer at the Closing, without the issuance of any additional Company Units to such Buyer in respect of such amount of the Buyer's additional capital contribution, but the obligation of the Company hereunder shall not be conditioned on performance by the Buyers of their obligations under this sentence.

If the amount per Company Unit that a Buyer pays for its Company Units issued at the Closing exceeds the Final Company Unit Value then the Company shall refund to such Buyer, as a return of a portion of its original capital contribution, an amount equal to the product of such excess and the number of Company Units issued to such Buyer at the Closing.

1.7     **Netting of Payments.**  In the event that, as a result of the determinations of Actual Working Capital, Actual Company Cash and Actual Pre-Closing Tax Liability pursuant to Section 1.6 above:

(a)     If the amounts that the Seller is required to pay to the Company (the "**Seller Payments**") exceed the amounts the Company is required to pay to the Seller (the "**Company Payments**"), then the Company shall not be required to pay any amount of the Company Payments to the Seller, and the Seller shall make a payment to the Company in an amount equal to the amount by which the amount of the Seller Payments exceeds the amount of the Company Payments; or

(b)     If the Company Payments exceed the Seller Payments, then the Seller shall not be required to pay any amount of the Seller Payments to the Company, and the Company shall make a payment to Seller in an amount equal to the amount by which the amount of the Company Payments exceeds the amount of the Seller Payments.

## ARTICLE II
## CLOSING

2.1 **Closing Date**. The closing of the transactions contemplated by this Agreement (the **"Closing"**) shall occur at the offices of Varnum, Riddering, Schmidt & Howlett LLP, in Grand Rapids, Michigan, unless another location is mutually agreed upon by the parties, and shall occur at 10:00 a.m., Eastern Time, on March 31, 2009, unless another time and date are mutually agreed upon by the parties (the **"Closing Date"**).

2.2 **Closing Deliveries by Seller**. At the Closing, the Seller shall execute and/or deliver to the Buyers and/or the Company all things required of them under this Agreement, including, without limitation, the following:

(a) Seller shall execute and deliver to the Company the Redemption Instrument attached hereto as **Schedule 2.2(a)**, conveying the Redeemed Company Units from the Seller to the Company as required by this Agreement;

(b) Seller shall deliver to the Company for cancellation all certificates representing the Redeemed Company Units; provided, however, that to the extent such certificates are currently in the possession of the Company's senior lender, Seller shall use reasonable efforts to cause such certificates to be delivered to the Company following the Closing.

(c) To the extent not already in the Company's possession, the Seller shall deliver to the Company the Company's minute book (the **"Company Records"**);

(d) Seller shall deliver to the Company a copy of each Transaction Document that is required to be signed by Seller (or its employees, agents or representatives) pursuant to the terms hereof (including, without limitation, to the extent required to be signed by Seller pursuant to the terms hereof, the Resignations, the Termination Agreement and the Confidentiality Agreement), in each case fully executed by Seller or Seller's employees, agents or representatives (as appropriate);

(e) Seller shall deliver to the Company a certificate signed by the secretary or another officer of Seller and dated as of the Closing Date, certifying (i) that the board of directors and stockholder of Seller adopted the resolutions attached to such certificate to authorize the transactions contemplated by this Agreement, and (ii) a specimen signature of an officer of Seller duly authorized to execute this Agreement and the other documents related to this Agreement that are to be signed by Seller;

(f) Seller shall deliver to the Company a certification of non-foreign status under the FIRPTA rules of the Internal Revenue Code of 1986, as amended (the **"Code"**);

(g) Seller shall deliver to the Company a true, correct and complete list of pay-off amounts for the Subordinated Indebtedness (the **"Subordinated Debt Pay-Off Certificate"**), and documentation reasonably acceptable to the Buyers that upon the payment of the amount listed in the Subordinated Debt Pay-Off Certificate, the Subordinated Indebtedness

6

will be paid and discharged in full and any Liens related to the Subordinated Indebtedness will be discharged;

(h)    Seller shall deliver to the Company a certificate from AC Corp stating the full amount of the Accrued Management Fee (the "**Management Fee Certificate**") and a certificate stating the full amount of the Other Company Fees and Expenses not required to be disclosed on the Company Fee and Expense Certificate to the extent not related to the transactions contemplated hereby (the "**Allied Fee and Expense Certificate**"); and

(i)    Seller shall deliver to the Company all other previously undelivered documents required to be delivered by the Seller to the Company and/or the Buyers at or prior to the Closing pursuant to the terms of this Agreement.

2.3    **Closing Deliveries by Buyers**. At the Closing, the Buyers shall execute and/or deliver to the Seller all things required of them under this Agreement, including, without limitation, the following:

(a)    Buyers shall cause the Company to make the payments required to be made by the Company pursuant to **Section 1.4(b)** and **Section 1.4(c)**;

(b)    Each of AVH and Hillsboro shall deliver to the Seller a certificate signed by the secretary or another officer of such Buyer and dated as of the Closing Date, certifying (i) that the shareholders, members, board of directors and board of managers, as applicable, of such Buyer adopted the resolutions attached to such certificate to authorize the transactions contemplated by this Agreement, and (ii) a specimen signature of an officer, manager, or member of such Buyer duly authorized to execute this Agreement and the other documents related to this Agreement that are to be signed by such Buyer;

(c)    The Buyers shall cause the Company to deliver to the Seller a certificate signed by the secretary or another officer of the Company and dated as of the Closing Date, certifying (i) that the board of managers of the Company adopted the resolutions attached to such certificate to authorize the transactions contemplated by this Agreement, and (ii) a specimen signature of an officer of the Company duly authorized to execute this Agreement and the other documents related to this Agreement that are to be signed by the Company;

(d)    Buyers shall deliver to the Seller copies of all Necessary Third Party Approvals that have been obtained by the Buyers as of the Closing Date;

(e)    Buyers shall cause the Company to deliver to the Seller a true, correct and complete calculation of all amounts owed by the Company as of the Closing Date to the Company Professional Advisor in connection with the transactions contemplated by this Agreement (the "**Fee Certification**");

(f)    The Buyers shall deliver to the Seller a true, correct and complete list of pay-off amounts for the Indebtedness of the Company other than the Subordinated Indebtedness and Indebtedness under the Ongoing Capital Leases (the "**General Pay-Off Certificate**") and documentation reasonably acceptable to Seller that upon payment of the amounts listed in the General Pay-Off Certificate the Indebtedness of the Company (other than the Subordinated Indebtedness and Indebtedness under the Ongoing Capital Leases) will be paid and discharged in

full and any Liens related to the Indebtedness of the Company (other than the Subordinated Indebtedness and Indebtedness under the Ongoing Capital Leases) will be discharged;

(g)     Buyers shall deliver to the Seller a certificate stating the full amount of Other Company Fees and Expenses to the extent they consist of legal and other professional fees incurred at the direction of the Company's management and not related to the transactions contemplated hereby (the "**Company Fee and Expense Certificate**").

(h)     Each Buyer shall deliver to the Seller a copy of each Transaction Document that is required to be signed by such Buyer pursuant to the terms hereof, in each case fully executed by such Buyer;

(i)     The Buyers shall cause the Company to deliver to Seller each Transaction Document that is required to be signed by the Company pursuant to the terms hereof (including, without limitation, the Termination Agreement and the Confidentiality Agreement), in each case fully executed by the Company; and

(j)     Buyers shall deliver to the Seller all other previously undelivered documents required to be delivered by the Buyers to the Seller at or prior to the Closing pursuant to the terms of this Agreement.

2.4     **Closing Deliveries by Allied**.   At the Closing, Allied shall deliver to the Company the Termination Agreement and the Confidentiality Agreement, fully executed by Allied.

2.5     **Further Assurances**.  The Buyers, the Company and the Seller each agree that they will, at any time and from time to time, after the Closing Date, upon the request of any other party hereto, execute, acknowledge and deliver, or use reasonable efforts to cause to be executed, acknowledged and delivered, all such further reasonable instruments, assignments, transfers, conveyances, assurances and other documents as may be required to properly effect the transactions contemplated by this Agreement.

2.6     **Sales and Transfer Taxes**.  Seller, on the one hand, and the Buyers, on the other hand, shall each be responsible for and shall pay one-half of all transfer, excise, property and sales taxes, stamps and similar items (the "**Sales and Transfer Taxes**") with respect to or arising from the transactions contemplated by this Agreement.  Sales and Transfer Taxes shall not include any sales, transfer, excise, property or other Taxes with respect to or arising from the conveyance of the Real Property from Apple Valley Holdings, Inc. to the Company or AVH Real Estate Holdings, LLC, a Michigan limited liability company;   accordingly, for the avoidance of doubt, Seller shall not be responsible for any such Taxes attributable thereto, and the same shall be excluded from the determinations of Enterprise Value and the adjustments applicable thereto.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to the Buyers and the Company on the date of this Agreement and on the Closing Date that the statements contained in Article III are true and correct.

3.1    **Organization**. Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware, with all requisite power and authority to carry on its business as now conducted, and to own, lease and operate its assets, properties and business.

3.2    **Authorization; Enforceable Agreement**. The execution, delivery and performance of this Agreement by Seller and Allied has been duly authorized by all necessary actions and proceedings, and Seller and Allied each has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement. This Agreement constitutes the valid and binding obligation of Seller and Allied, and is enforceable against Seller and Allied in accordance with its terms.

3.3    **Capitalization; Capital Accounts**.

(a)    Other than the operating agreement included in the Organizational Documents, none of the Seller nor any of its affiliates (as such term is defined in Rule 405 promulgated under the Securities Act) (each, an **"Affiliate"**), other than the Company, is a party to or is bound by any, and there are no, agreements or understandings with respect to the voting (including voting trusts and proxies) or sale or transfer (including agreements imposing transfer restrictions) of the Redeemed Company Units. There are no registration rights, and there is no rights agreement, "poison pill" anti-takeover plan or other agreement or understanding to which Seller is a party or by which Seller is bound with respect to the Redeemed Company Units.

(b)    All capital contributions of the Seller required to be made under the operating agreement contained in the Organizational Documents have been fully paid.

(c)    Seller is the record and beneficial owner of its Company Units, free and clear of any Lien (including any restriction on the right to vote, sell or otherwise dispose of the Company Units), other than the operating agreement included in the Organizational Documents, applicable securities laws and the terms of this Agreement, and Seller will transfer and deliver to the Company at the Closing valid title to the Redeemed Company Units free and clear of any Lien, except for the operating agreement contained in the Organizational Documents and applicable securities laws. Following the Closing, Seller shall have transferred and conveyed all of its Company Units to the Company and neither the Seller nor Allied shall have any equity ownership interest or other interest in the Company or any of its assets.

3.4    **No Conflict**.

(a)    The execution and delivery of this Agreement by Seller and Allied does not, and the consummation of the transactions contemplated by this Agreement by Seller and Allied will not (i) conflict with, or result in any violation or breach of, or require any consent under, any provision of any of the Organizational Documents of the Company or the Seller; (ii) conflict with, or result in any violation or breach of, constitute (with or without notice or lapse of time, or both) a default or require a consent or waiver under, any Contract to which Seller is a party; or (iii) violate any permit, concession, license, judgment, injunction, order, decree, statute, law, ordinance, governmental rule or governmental regulation (each, a **"Law"**) applicable to Seller.

(b)    No filing, registration, declaration, or notice with, consent, approval, license, permit, order, authorization or waiver of, or other action by, any third party, including

9

any Governmental Authority, is necessary in connection with Seller's execution of this Agreement or Seller's consummation of the transactions contemplated by this Agreement.

3.5    **Contracts.** Neither Seller nor Allied, nor any of their Affiliates (other than the Company) nor, to Seller's Knowledge, any of their current employees, former employees (with respect only to such former employees' period of employment with Allied, Seller or any of their Affiliates (other than the Company)), agents or representatives has entered into any Contract on behalf of the Company other than Contracts which are no longer in effect as of the Effective Date and in connection with which no amounts are payable.

3.6    **Certifications.** The Allied Debt Pay-Off Certification, the Management Fee Certificate, the Allied Fee and Expense Certificate are true, correct and complete, and accurately reflect all amounts owed as indicated therein.

3.7    **Affiliated Transactions.** Except for the operating agreement contained in the Organizational Documents, the Subordinated Debt Documents, the Management Agreement, the agreements referenced in the Termination Agreement, the Confidentiality Agreement and this Agreement, and the transactions contemplated thereby, (i) there exists no contract, agreement, obligation, promise or undertaking (whether written or oral) between the Company and Seller or Allied (or any of their Affiliates) or to Seller's Knowledge, any of their current employees, former employees (with respect only to such former employees' period of employment with Allied, Seller or any of their Affiliates (other than the Company)), agents or representatives, and (ii) the Company has not entered into any transaction with Seller or Allied (or any of their Affiliates) or to Seller's Knowledge, any of their current employees, former employees (with respect only to such former employees' period of employment with Allied, Seller or any of their Affiliates (other than the Company)), agents and representatives other than transactions which are not ongoing as of the Effective Date and in connection with which no amounts are payable.

3.8    **Brokers or Finders.** No agent, broker, investment banker, financial advisor or other firm or person is or shall be entitled, as a result of any action, agreement or commitment of the Seller, or of any of its Affiliates (other than the Company), to any broker's, finder's, financial advisor's or other similar fee or commission in connection with any of the transactions contemplated by this Agreement.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF BUYER AND THE COMPANY

Each Buyer and the Company (each of them, a **"Buyer Indemnitor"**) severally (and not jointly) hereby represents and warrants, with respect to itself and not with respect to the other Buyer Indemnitors, on the date hereof and on the Closing Date to Seller that the statements contained in Article IV are true and correct, except as set forth in the disclosure schedules delivered by the Buyer Indemnitors to the Seller on the date of this Agreement (the **"Buyers' Schedules"**). The Buyers' Schedules shall be arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs contained in Article IV, and the disclosure in any section or paragraph shall qualify (1) the corresponding section or paragraph in Article IV, and (2) such other sections and paragraphs in Article IV to which such disclosure, reasonably interpreted, clearly applies.

10

4.1    **Organization**.

(a)  AVH is a corporation duly incorporated, validly existing and in good standing under the laws of Michigan. Hillsboro is a limited liability company, duly organized, validly existing and in good standing under the laws of the state of Michigan. Each of Veltman and Vredevelt is a Michigan resident. The Trusts are validly existing.

(b)  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Michigan, with all requisite power and authority to carry on its Business as now conducted, and to own, lease and operate its assets, properties and Business.

4.2    **Authorization; Enforceable Agreement**.

(a)  The execution, delivery and performance of this Agreement by each Buyer has been duly authorized by all necessary actions and proceedings, and such Buyer has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement constitutes the valid and binding obligation of such Buyer, and is enforceable against such Buyer in accordance with its terms.

(b)  The execution, delivery and performance of this Agreement by the Company has been duly authorized by all necessary actions and proceedings, and the Company has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement constitutes the valid and binding obligation of the Company, and is enforceable against the Company in accordance with its terms.

4.3    **No Breach**.

(a)  Except as specified in **Schedule 4.3**, neither the execution and delivery of this Agreement by the Buyers and the Company nor the consummation of the transactions contemplated hereby by the Buyer and the Company will (i) conflict with, or result in any violation or breach of, any provision of the articles of organization, articles of incorporation, bylaws or operating agreement, as applicable, of such Buyer; (ii) conflict with, or result in any violation or breach of, any provision of any of the Organizational Documents; (iii) conflict with, or result in any violation or breach of, constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit) under or termination of (or otherwise give any other contracting party the right to terminate), or require a consent or waiver under, any Contract to which the Company is a party, unless such violation, breach, default or termination, or the failure to obtain such consent or waiver, would not be reasonably likely to result in a material liability of or cause a material loss of rights or benefits of the Seller; (iv) conflict with, or result in any violation or breach of, constitute (with or without notice or lapse of time, or both) a default or require a consent or waiver under, any Contract to which any Buyer is a party, or (v) violate any Law applicable to any Buyer, the Company or any of their respective properties or assets.

(b)  Except for filings identified in **Schedule 4.3**, no filing, registration, declaration, or notice with, consent, approval, license, permit, order, authorization or waiver of, or other action by, any third party, including any Governmental Authority, is necessary in connection with any Buyer's or the Company's execution of this Agreement or the Company's or any Buyer's consummation of the transactions contemplated by this Agreement unless the failure

11

to obtain such would not be reasonably likely to result in a liability of or cause a loss of rights or benefits of the Seller.

4.4 **Certifications.** The Fee Certification, the General Pay-Off Certificate and the Company Fee and Expense Certificate are true, correct and complete, and accurately reflect all amounts owed as indicated therein.

4.5 **Brokers or Finders.** Except for the Company Professional Advisor, no agent, broker, investment banker, financial advisor or other firm or person is or shall be entitled, as a result of any action, agreement or commitment of such Buyer, the Company (unless resulting from the actions of Seller or Allied, their current employees, former employees (with respect only to such former employees' period of employment with Allied, Seller or any of their Affiliates (other than the Company)), agents or representatives) or any of their Affiliates, to any broker's, finder's, financial advisor's or other similar fee or commission in connection with any of the transactions contemplated by this Agreement.

4.6 **Securities Laws.** Such Buyer (a) has substantial experience in evaluating and investing in companies similar to the Company, so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests; (b) is acquiring its Buyer Company Units for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof; (c) understands that the Company Units have not been registered under the Securities Act of 1933, as amended (the **"Securities Act"**); (d) understands that the Buyer Company Units must be held indefinitely unless subsequently registered under the Securities Act and registered and/or qualified under all applicable state securities Laws, or unless an exemption from such registration and qualification is available; (e) is able to bear the economic risk of its investment in the Buyer Company Units and to continue to be able to bear the economic risk of its investment in the Buyer Company Units for an indefinite period; and (f) has had an opportunity to ask questions and receive answers concerning the terms and conditions of the sale of the Buyer Company Units and has had full access to such other information concerning the Company as it has requested.

### ARTICLE V
### OTHER AGREEMENTS

5.1 **Organizational Documents.** Seller, Buyers and the Company hereby acknowledge and agree that copies of the Company's articles of organization and operating agreement as in effect on the date hereof (collectively the **"Organizational Documents"**) are attached hereto as **Schedule 5.1**.

5.2 **Termination Agreement.** At the Closing, the Seller, the Buyers, Allied and the Company shall execute and enter into, and Allied shall cause AC Corp to execute and enter into, a termination agreement in the form attached as **Schedule 5.2** terminating certain Contracts among the parties (the **"Termination Agreement"**).

5.3 **Resignations.** At the Closing, Seller shall cause Mr. Craig Hille, Ms. Lee Lesley and Mr. Mark Raterman to each execute a resignation in the form attached as **Schedule 5.3** (the **"Resignation"**).

5.4    **Confidentiality Agreement.** At the Closing, Seller shall execute and enter into, and cause Allied and AC Corp to execute and enter into, a confidentiality agreement in the form attached as **Schedule 5.4** (the **"Confidentiality Agreement"**), and the Company shall countersign the Confidentiality Agreement.

5.5    **Retention of Records.** After the Closing Date, the Company shall keep and preserve all Company Records delivered by Seller to the Company, and all other books, records and documents otherwise related to the Company or the operation of the Business during any period prior to the Closing Date (collectively, the **"Retained Records"**), for a period of five (5) years after the Closing Date or for such longer time as is required by Law. The Company shall make all such Retained Records available to Seller at any reasonable time during normal business hours, upon Seller's reasonable request, following reasonable advance notice from Seller, for the purpose of assisting Seller in complying with any applicable Law, fulfilling any of its obligations, resolving any dispute with a third party or for any other reasonable purpose. Notwithstanding the foregoing, should the Company wish to destroy any Retained Records or any portion thereof prior to the date provided above, the Company may give Seller not less than thirty (30) days prior written notice of its intention to destroy such Retained Records. Seller shall then have the right to take possession of such Retained Records, and to the extent Seller does not exercise such right within such thirty (30) day period, the Company may destroy such Retained Records as to which it has provided the notice described above.

5.6    **Tax Treatment; Elections.**

(a)    The parties agree that the treatment for federal income tax purposes (and for state, local and foreign income tax purposes, to the extent consistent with applicable law) of the transactions contemplated by this Agreement is as provided in this Section 5.6, which tax treatment is considered consistent with applicable federal tax law. Further, the parties agree to file all Tax Returns on a basis consistent with the following:

(i)    Immediately prior to the transactions contemplated by this Agreement, the Company shall be caused to determine a current fair market value of its assets, including intangible assets (taking into account section 7701(g) of the Code) and, correspondingly, shall increase or decrease the capital account of the Seller to reflect said revaluation of partnership assets, in accordance with Treasury Regulation § 1.704-1(b)(2)(iv).

(ii)    To the extent of the Buyers' Capital Contributions, the proceeds of which will be distributed to the Seller as part of the consideration paid to Seller by the Company for the Redeemed Company Units (the **"Redemption Price"**), each Buyer shall be treated as having purchased Company Units from the Seller and Seller shall be treated as having sold a ratable share of its Company Units to each Buyer in a taxable transaction under section 741 of the Code. Correspondingly, any special basis adjustments to the assets of the Company attributable to this transaction shall be made pursuant to section 743(b) of the Code.

(iii)    The remaining Redemption Price distributed by the Company to Seller shall be regarded as a liquidating distribution subject to section 731 of the Code. Correspondingly, any special basis adjustments to the assets of the Company attributable to these deemed transactions shall be made pursuant to section 734(b) of the Code.

(iv) In the event Seller incurs an obligation to make a payment to the Company pursuant to Section 1.6(c), said payment shall be regarded as an adjustment to the Redemption Price previously paid to the Seller.

(b) The parties hereto acknowledge that the transactions contemplated by this Agreement, constituting, for tax purposes, in part a sale and purchase of Company Units by and between the Seller and the Buyers, and in part a redemption of Company Units by the Company, may result in a termination of the Company for federal income tax purposes. In any event, with respect to any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "Straddle Period"), the parties agree to cause the Company to adopt the interim closing-of-the-books method and to assign (i) to that portion of the Straddle Period that precedes and ends on the Closing Date the items of income, gain, loss, and deduction that arise in or are attributable to that portion of the Straddle Period, and (ii) to that portion of the Straddle Period that begins on the day following the Closing Date, the items of income, gain, loss, and deduction that arise in or are attributable to that portion of the Straddle Period. Provided, however, with respect to any property Tax, ad valorem Tax or other similar Tax, such Taxes shall be prorated on a daily basis for the Straddle Period. Seller shall reimburse the Company for its Pro Rata Percentage of any Taxes shown to be payable on such Tax Return that are attributable to that period that begins after April 30, 2007 and ends upon the Closing Date, except to the extent said Tax liability is taken into account in calculating the Redemption Price. Prior to filing any such Tax Return, if the Tax Return were to show a Tax liability for which Seller may be responsible under this Agreement or which may affect in any manner Seller's Tax liability, the Company agrees to provide the Seller with a copy of such Tax Return prior to filing of the same for Seller's review and approval, which approval shall not be unreasonably delayed or withheld. For purposes of all tax calculations pro rations to the AVH Real Estate shall be deemed an asset of the Company and all Taxes related thereto shall be pro rated as provided herein.

(c) With respect to the transactions contemplated by this Agreement, the parties agree to use the determination of relative fair market values of the Company's assets, pursuant to Section 5.6(a), for purposes of making any allocations under applicable Tax law (for example, under Code Section 751 or for purposes of adjusting the tax basis for the assets of the Company following the Closing). Any allocation to be made with respect to the Redeemed Company Units for such purposes will be reasonably agreed to by Buyers and the Seller in writing within sixty (60) days of the Closing Date.

5.7    **Tax Matters.**

(a) The Company shall have the obligation and authority to file or cause to be filed all Tax Returns for the Company arising in connection with any taxable year or other taxable period ending on or before the Closing Date (a "Pre-Closing Period") in accordance with the then applicable operating agreements and consistent with past practice of the Company. Prior to filing of any Tax Return described in this Section 5.7(a), the Company shall provide a copy of such Tax Return to the Seller for its review and approval, which approval shall not be unreasonably delayed or withheld. Seller shall reimburse the Company for its Pro Rata Percentage of any Taxes shown to be payable by the Company on any such Tax Return, except to the extent said Tax liability is taken into account in calculating the Redemption Price; provided, however, that in no event shall Seller be required to reimburse the Company for any Taxes relating to any period or any portion of any period ending on or before April 30, 2007.

14

(b)     The Company, at its sole cost, shall have the authority to control any audit or examination by any Governmental Authority, initiate any claim for refund, amend any Tax Return, and contest, resolve and defend against any assessment for additional Taxes, notice of Tax deficiency or other adjustment of Taxes of or relating to any liability of or with respect to the Company for Taxes for any Pre-Closing Period; provided, however, the Company agrees (i) to provide to the Seller a copy of any such claim for refund or amendment to any such Tax Return for Seller's review prior to the Company filing of the same; and (ii) to inform the Seller on a timely basis of all material developments during the course of any such audit, examination or other contest of an assessment or other adjustment relating to any liability of or with respect to the Company for Taxes.

(c)     The Company shall have the obligation and authority to file or cause to be filed all Tax Returns for the Company for any taxable year or other taxable period ending after the Closing Date (a "Post-Closing Period") (including any Tax Return for a Straddle Period), and shall pay any Tax shown to be due. Prior to filing any such Tax Return, if the Tax Return were to show a Tax liability for which Seller may be responsible under this Agreement or which may affect in any manner Seller's Tax liability, the Company agrees to provide the Seller with a copy of such Tax Return prior to filing of the same for Seller's review and approval, which approval shall not be unreasonably delayed or withheld. The Company shall have the authority to control any audit or examination by any Governmental Authority, initiate any claim for refund, file or amend any Tax Return, or contest, resolve and defend against any assessment for additional Taxes, notice of Tax deficiency or other adjustment of Taxes of or relating to any liability of or with respect to the Company for Taxes for any Post-Closing Period, it being understood the same shall be the Company's responsibility.

(d)     Buyers or the Company, as the case may be, shall promptly forward to the Seller all written notifications and other communications from any Governmental Authority received by any Buyer or the Company relating to any Tax audit or other proceeding relating to the Tax liability of or with respect to the Company with respect to a Pre-Closing Period, or with respect to any Post-Closing Period if the results of such audit or other proceeding may affect in any manner Seller's Tax liability.

(e)     Buyers shall cause the Company to provide the Seller, and the Seller shall provide Buyers and the Company, with such assistance as may be reasonably requested in connection with the preparation of any Tax Return, any audit, or any judicial or administrative proceeding or determination relating to liability for Taxes of the Company, including but not limited to, access to the books and records of the Company. Buyers and the Seller shall retain or shall cause the Company to retain all Tax Returns, schedules, work papers and all material records or other documents relating to Tax matters of the Company until the later of (i) seven years after the later of filing or the due date of the return, and (ii) the expiration of all applicable statutes of limitation, and provide each other with any record or information (including making employees available to such other party for reasonable periods of time) that may be relevant to such Tax Return, audit, proceeding or determination. The Seller shall not destroy or dispose of or allow the destruction or disposition of any books, records or files relating to the Business, properties, assets or operations of the Company for Pre-Closing Periods without first having offered in writing to deliver such books, records and files to the Company. The Seller shall be entitled to dispose of the books, records and files described in such written notice if the Company fails to request such books, records and files (or copies thereof) within ninety (90) days after receipt of the written notice described in the preceding sentence.

15

(f)    Any refund or credit of Taxes of the Company (i) for any Pre-Closing Period or any portion of a Pre-Closing Period beginning after April 30, 2007 shall be apportioned between the Buyers and the Seller in accordance with their respective Pro Rata Percentages, (ii) for any taxable period beginning after the Closing Date shall be for the account of the Company and (iii) for any Straddle Period shall be equitably apportioned between the Seller, the Buyers and the Company, as the case may be, in the same manner as the underlying Tax is apportioned. Upon receipt of any refund or credit that is (in whole or in part) for the account of the Seller, the Company shall promptly pay to Seller an amount equal to the portion of such refund or credit that is for the account of the Seller.

## ARTICLE VI
## INDEMNIFICATION

6.1    **Survival of Representations and Warranties**.    The representations and warranties contained in Articles 3 and 4 of this Agreement, other than the representations and warranties contained in Sections 3.5 and 3.7, shall survive the Closing Date indefinitely. The representations and warranties contained in Sections 3.5 and 3.7 shall survive the Closing Date for a period of two years.

6.2    **Indemnification by Seller**.    Subject to the other provisions of this Article 6, Seller shall indemnify the Buyers, the Company and their respective shareholders, directors, employees and agents (collectively, **"Buyer Indemnified Parties"**) against and hold them harmless from losses, damages, liabilities, Taxes and reasonable costs and reasonable expenses (including, without limitation, reasonable attorneys' fees) incurred by the Buyer Indemnified Parties, to the extent caused by any breach of or inaccuracy in any representation or warranty made by the Seller in this Agreement, any failure of the Subordinated Debt Pay-Off Certificate, the Management Fee Certificate or the Allied Fee and Expense Certificate to be true, accurate and complete or any breach by the Seller of any covenant or agreement made by the Seller in this Agreement (collectively, the **"Buyer Indemnified Losses"**).

6.3    **Indemnification by Buyer Indemnitors**.    Subject to the other provisions of this Article 6 (i) each Buyer Indemnitor shall severally and not jointly indemnify the Seller and its shareholders, directors, employees, trustees and agents (collectively, **"Seller Indemnified Parties"**) against and hold them harmless from losses, damages, liabilities and reasonable costs and reasonable expenses (including, without limitation, reasonable attorneys' fees) incurred by the Seller Indemnified Parties, to the extent caused by any breach of or inaccuracy in any representation or warranty made by such Buyer Indemnitor in this Agreement or any breach by such Buyer Indemnitor of any covenant or agreement made by such Buyer Indemnitor in this Agreement, and (ii) the Company shall indemnify the Seller Indemnified Parties against and hold them harmless from losses, damages, liabilities and reasonable costs and reasonable expenses (including, without limitation, reasonable attorneys' fees) incurred by the Seller Indemnified Parties, to the extent caused by any failure of the Fee Certification, the General Pay-Off ·Certificate or the Company Fee and Expense Certificate to be true, accurate and complete (the losses, damages, liabilities, costs and expenses referred in (i) and (ii) are referred to collectively as the **"Seller Indemnified Losses"**).

6.4    **Claims Procedure**.

(a)    If any party at any time believes that it is entitled to indemnification under this Article 6, such party shall provide prompt written notice to the party(ies) who it believes is

obligated to provide such indemnification, and such written notice shall describe in reasonable detail the basis for the purported indemnification obligation, and shall set forth such first party's calculation of the amount of the purported indemnification obligation; provided, however, that delay in the delivery of any such notice shall not preclude recovery by the Indemnitee from the Indemnifying Party pursuant to this Article 6, except and only to the extent that the Indemnifying Party is prejudiced by such delay.

(b)     In addition to the foregoing, if any legal proceeding, claim, investigation or suit shall be instituted or threatened by any third party ("Claim") with respect to which Seller Indemnified Parties on the one hand, or Buyer Indemnified Parties on the other hand, may be entitled to indemnity hereunder, the party who may be entitled to indemnity (the "Indemnitee") shall give the party(ies) from whom indemnity is (or may be) sought (the "Indemnifying Party") prompt written notice of the Claim (the "Claims Notice"); provided, however, that delay in the delivery of any Claims Notice shall not preclude recovery by the Indemnitee from the Indemnifying Party pursuant to this Article 6, except and only to the extent that the Indemnifying Party is prejudiced by such delay. The Claims Notice shall describe the Claim in reasonable detail and shall, to the extent practicable, indicate a reasonable estimate of the amount of the Buyer Indemnified Losses or the Seller Indemnified Losses, as the case may be, that have been or may be suffered by the Indemnitee with respect to the Claim. The Indemnifying Party shall be entitled (but not obligated) by the delivery of a written notice to the Indemnitee at any time after its receipt of the Claims Notice to assume the defense of the Claim (the "Defense"), and if the Indemnifying Party so elects to assume the Defense, it shall be entitled to the full and exclusive right to control and direct the Defense, with counsel of its choosing, and to make all decisions related to the Defense and with respect to any negotiation or settlement (or refusal to agree to a settlement) with respect to the Claim; provided, however, that the Indemnifying Party shall not be entitled to settle any Claim that imposes any restriction or obligation on the Indemnitee other than the payment of money, for which the Indemnifying Party will be responsible and will pay at the time of settlement. In any instance in which either the Indemnitee or the Indemnifying Party controls a Defense pursuant to this Section 6.4(b), the other party shall continue to have the right to be represented, at its own expense (for which such party shall not be entitled to indemnification), by counsel of its choice in connection with the Defense, but shall have no right to control or direct the defense. The parties hereto agree to cooperate fully with each other in connection with any Defense, and each party, without cost to the other party, shall make available to the other party and its attorneys all books, records and information of such party relating to such Defense or such Claim.

6.5     **Net Liability; Subrogation**. For the purpose of this Article 6, in computing any individual or aggregate amounts of losses, damages, liabilities, costs and expenses for indemnification, the amount of each such item shall be deemed to be an amount (a) net of any net tax benefit realized by the party to be indemnified (net of Tax costs and reasonable expenses of realizing such Tax benefit); and (b) net of any net insurance proceeds recovered in respect thereof by the party to be indemnified and any net indemnity, contribution or other similar payment paid by any third party to the party to be indemnified with respect thereto (net of reasonable expenses of realizing such recovery). In the event that the Indemnifying Party shall be obligated to indemnify the Indemnified Party pursuant to this Article 6, the Indemnifying Party shall upon payment of such indemnity in full, be subrogated to all rights of the Indemnified Party with respect to the loss to which such indemnification relates; provided, however, that the Indemnifying Party shall only be subrogated to the extent of any amount paid by it pursuant to this Article 6 in connection with such loss.

6.6     **Exclusive Remedy**. From and after the Closing the indemnification provisions of this Article 6 constitute the sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement (and all related agreements), other than claims for actual and intentional fraud, and claims for specific performance and no other remedy shall be had in Law or at equity or otherwise by any party or its officers, directors, employees, agents, affiliates, attorneys, consultants, successors or assigns, all such remedies being hereby expressly waived to the fullest extent permitted under applicable Law.

6.7     **Guarantee.** Allied guarantees all obligations and liabilities of Seller under this Agreement and the other Transaction Documents, including Seller's indemnification obligations under this Article VI.

## ARTICLE VII
## MISCELLANEOUS

7.1     **Publicity**. Prior to Closing, the Buyers, the Seller and Allied and, following the Closing, the Seller and Allied, will not make, nor will they permit any of their officers, directors, employees or other representatives to make, any disclosure or other release of information concerning this Agreement or the transactions contemplated by this Agreement or the negotiations related thereto without the prior written consent of all of the other parties; provided, however, that the foregoing shall not prevent the parties from disclosing such information to their respective employees, professional advisors and lenders who have a need to know the information and who agree to keep such information confidential; and provided, further, that the foregoing shall not prevent the parties from disclosing such information to the extent its counsel deems such disclosure necessary to comply with applicable Law.

7.2     **Fees and Expenses**. Except as otherwise stated in this Agreement, all expenses incurred by the parties hereto shall be borne solely and entirely by the party that has incurred such expenses.

7.3     **Notices**. Except as otherwise set forth in this Agreement, all notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, or if mailed, certified or registered mail, postage prepaid, or by prepaid Federal Express, as follows:

        (a)     if to AVH or the Trusts:

                5555 Michigan Street NE
                Ada, MI 49301
                Attention: Mr. Mark Saur

                with a copy to:

                Varnum LLP
                Bridgewater Place
                P.O. Box 352
                Grand Rapids, MI 49501-0352
                Attention: Michael Wooldridge, Esq.
                            Peter Roth, Esq.

18

(b)    if to Veltman or Hillsboro:

   2089 Knollpoint, N.E.
   Ada, MI 49301
   Attention: Mr. Howard Veltman

   with a copy to:

   Varnum LLP
   Bridgewater Place
   P. O. Box 352
   Grand Rapids, Michigan 49501-0352
   Attention: Michael Wooldridge, Esq.
              Peter Roth, Esq.

(c)    if to Vredevelt:

   733 Bradford Farm Lanes
   Grand Rapids, Michigan 49525

(d)    if to Allied or Seller:

   c/o Allied Capital Corporation
   1919 Pennsylvania Avenue, NW
   Washington, DC 20006
   Attention: Craig Hille

   with copy to:

   Sutherland
   1275 Pennsylvania Avenue, NW
   Washington, DC 20004
   Attention: James Darrow, Esq.
              Robert Copps, Esq.

(e)    if to Company:

   Old Orchard Brands LLC
   P.O. Box 66
   Sparta, MI 49345

   with copy to:

   Varnum, LLP
   Bridgewater Place
   P. O. Box 352
   Grand Rapids, Michigan 49501-0352
   Attention: Michael Wooldridge, Esq.
              Peter Roth, Esq.

19

or to such other address as any party shall have specified by notice in writing to the other parties. All such notices, requests, demands and communications shall be deemed to have been received on the date of personal delivery or telecopy or on the third business day after the mailing thereof.

7.4     **Counterparts**. This Agreement may be executed in one more counterparts, each of which shall be considered an original counterpart, and shall become a binding agreement when each party shall have executed one counterpart and delivered it to the other party.

7.5     **Schedules and Exhibits**. The schedules and exhibits referred to in this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if set forth verbatim herein.

7.6     **Interpretation**. Wherever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms. As used in this Agreement, the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." As used in this Agreement, the terms "herein," "hereof," and "hereunder" shall refer to this Agreement in its entirety. Any references in this Agreement to "Sections" or "Articles" shall, unless otherwise specified, refer to Sections or Articles, respectively, of this Agreement. Where something is defined in the singular, the plural of the defined term will be taken to mean two or more of those things which are within the definition; and where something is defined in the plural or collectively, the singular of the defined term will be taken to mean any one of those things which fall within the definition.

7.7     **Applicable Law; Jurisdiction; Venue**. The terms and conditions of this Agreement shall be governed, construed, interpreted and enforced in accordance with the domestic laws of the state of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the state of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the state of New York. Any and all actions concerning any dispute arising hereunder shall be filed and maintained only in the Circuit Court of Kent County, Michigan or the federal District Court for the Western District of Michigan. The parties specifically consent and submit to the jurisdiction and venue of such state or federal court, and irrevocably waive any objections such party may have based on improper venue or forum non conveniens to the conducting of any proceeding in any such court.

7.8     **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and lawful assigns. No party may assign or delegate this Agreement without the prior written consent of the other parties. Any purported assignment or delegation of this Agreement, in whole or in part, without the prior written consent of the non-assigning party shall be void and of no effect. Notwithstanding the foregoing, any Buyer may assign this Agreement to an entity wholly owned by such Buyer without obtaining Seller's prior written consent; provided, however, that following any such assignment, such Buyer shall remain responsible and liable for all its obligations hereunder notwithstanding the assignment.

7.9     **Modification**. This Agreement cannot be amended, supplemented, altered or otherwise modified, unless done so in a writing, signed by a duly authorized representative of all of the parties.

20

7.10  **Waiver.** No provision of this Agreement shall be waived by any party hereto, unless such waiver is in a writing, signed by a duly authorized representative of the party against whom such waiver is sought to be enforced. A waiver by any party of any breach or failure to comply with any provision of this Agreement by the other party shall not be construed as or constitute a continuing waiver of such provision or a waiver of any other breach of or failure to comply with any other provision of this Agreement.

7.11  **Severability.** The parties believe that every provision of this Agreement is effective and valid under applicable Law, and whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid. If any portion of this Agreement is found to be invalid or unenforceable for any reason, any court or other tribunal adjudicating the rights and duties of the parties under this Agreement shall alter, modify or strike portions of the Agreement so that it will be enforceable to the fullest extent permitted by Law. If any provision of this Agreement is held, in whole or in part, to be invalid, the remainder of such provision and this Agreement shall remain in full force and effect, with the offensive term or condition being stricken to the extent necessary to comply with any conflicting Law.

7.12  **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement. The provisions of this Agreement shall supersede all contemporaneous oral agreements, communications and understandings and all prior oral and written communications, agreements and understandings between the parties with respect to the subject matter of this Agreement. Each party acknowledges that no representation, inducement or condition not set forth herein has been made or relied upon by such party.

7.13  **Headings.** The headings and bold face type used herein have been used for the convenience of the parties and are not to be used in construing this Agreement.

7.14  **Schedules.** Any fact or item disclosed on any Buyers' Schedules hereto shall not by reason only of such inclusion be deemed to be material and shall not be employed as a point of reference in determining any standard of materiality under this Agreement.

7.15  **No Strict Construction.** Notwithstanding the fact that this Agreement has been drafted or prepared by one of the parties, each of the parties confirms that both it and its counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the parties, and the language used in this Agreement shall be deemed to be the language chosen by the parties thereto to express their mutual intent, and no rule of strict construction shall be applied against any person.

7.16  **No Third-Party Rights.** Except as specifically provided herein, nothing in this Agreement is intended to (and nothing in this Agreement will) confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party, nor shall any provisions give any third persons any right or subrogation over or action against any party.

7.17  **No Other Representations or Warranties.** Except for the representations and warranties specifically and expressly set forth in Article 3 of this Agreement, the Buyers and the Company acknowledge that neither the Seller nor any other person or entity acting on behalf of the Seller, makes or has made any other express or implied representation or warranty to the

Buyers or the Company (including, without limitation, implied warranties of merchantability and fitness for a particular purposes) related to the Company or its business, assets or liabilities or with regard to any other matter, or as to the accuracy or completeness of any information regarding the Company or its business, assets or liabilities provided to the Buyers or their representatives or with regard to any other matter, each such express or implied warranty being specifically disclaimed by Seller.

## ARTICLE VIII
## DEFINITIONS

8.1     Definitions. For purposes of this Agreement, the following terms and phrases shall have the meanings specified below in this Section 8.1:

"AC Corp" means A.C. Corporation, a Delaware corporation.

"Accrued Management Fee" means any and all fees and reimbursable expenses owed by the Company to AC Corp, Allied or their Affiliates pursuant to that certain Management and Monitoring Services Agreement, dated April 30, 2007, between AC Corp and the Company, excluding any such fees and expenses related to or resulting from the transactions contemplated hereby.

"Actual Company Cash" has the meaning set forth in Section 1.6(b).

"Actual Pre-Closing Tax Liability" has the meaning set forth in Section 1.6(b).

"Actual Working Capital" has the meaning set forth in Section 1.6(b).

"Affiliate" has the meaning set forth in Section 3.3(a).

"Agreement" has the meaning set forth in the opening paragraph of this Agreement.

"Allied" has the meaning set forth in the opening paragraph of this Agreement.

"Allied Fee and Expense Certificate" has the meaning set forth in Section 2.2(h).

"Auditor" has the meaning set forth in Section 1.6(b).

"AVH" has the meaning set forth in the opening paragraph of this Agreement.

"AVH Real Estate" means the real estate located at 1991 - 12 Mile Road, N.W., Sparta, Michigan 49345.

"Business" has the meaning set forth in the Recitals.

"Buyers" has the meaning set forth in the opening paragraph of this Agreement.

"Buyer Capital Contribution" has the meaning set forth in Section 1.1.

"Buyer Company Units" has the meaning set forth in Section 1.1.

"Buyer Indemnified Losses" has the meaning set forth in Section 6.2.

"Buyer Indemnified Parties" has the meaning set forth in Section 6.2.

"Buyer Indemnitor" has the meaning set forth in the introductory paragraph to Article IV.

"Buyers' Schedules" has the meaning set forth in the introductory paragraph to Article IV.

"Calculation" has the meaning set forth in Section 1.6(b).

"Cash" means cash and cash equivalents, including money market accounts, bank accounts and certificates of deposit, and similar current assets, as determined in accordance with GAAP.

"Claim" has the meaning set forth in Section 6.4(b).

"Claims Notice" has the meaning set forth in Section 6.4(b).

"Closing" has the meaning set forth in Section 2.1.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" has the meaning set forth in Section 2.2(f).

"Company" has the meaning set forth in the opening paragraph of this Agreement.

"Company Fee and Expense Certificate" has the meaning set forth in Section 2.3(g).

"Company Payments" has the meaning set forth in Section 1.7(a).

"Company Professional Advisor" means Sawaya Segalas & Co., LLC.

"Company Records" has the meaning set forth in Section 2.2(c).

"Company Units" has the meaning set forth in the Recitals.

"Confidentiality Agreement" has the meaning set forth in Section 5.4.

"Contract" means any agreement, contract, plan, lease, license, mortgage, or option.

"Defense" has the meaning set forth in Section 6.4(b).

"Effective Date" has the meaning set forth in the opening paragraph of this Agreement.

"Enterprise Value" has the meaning set forth in Section 1.3.

"Estimated Calculation" has the meaning set forth in Section 1.6(a).

"Estimated Company Cash" has the meaning set forth in Section 1.6(a).

23

"Estimated Enterprise Value" has the meaning set forth in Section 1.4.

"Estimated Pre-Closing Tax Excess" shall mean the excess, if any, of (a) all payments (including estimated Tax payments) previously made by the Company with respect to the Pre-Closing Tax Liability, over (b) the Estimated Pre-Closing Tax Liability.

"Estimated Pre-Closing Tax Liability" has the meaning set forth in Section 1.6(a).

"Estimated Working Capital" has the meaning set forth in Section 1.6(a).

"Estimated Working Capital Excess" means the amount, if any, by which the Estimated Working Capital is more than the Working Capital Threshold Amount.

"Fee Certification" has the meaning set forth in Section 2.3(e).

"Final Company Unit Value" has the meaning set forth in Section 1.3.

"General Pay-Off Certificate" has the meaning set forth in Section 2.3(f).

"Governmental Authority" means any of the following: (a) the United States of America and any foreign country; (b) any state, commonwealth, territory or possession of the United States of America or any other state or country; (c) any political subdivision of any of the foregoing (including, without limitation, counties, municipalities and the like); and (d) any agency, authority or instrumentality of any of the foregoing, including, without limitation, any court, tribunal, department, bureau, commission or board.

"Indebtedness" means, with respect to any Person, without duplication, (i) all obligations of such person for borrowed money, (ii) all payment obligations of such person evidenced by bonds, debentures, notes or similar instruments, (iii) all payment obligations of such Person upon which interest charges are customarily paid, (iv) all payment obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (v) all payment obligations of such person issued or assumed as the deferred purchase price of property or services (excluding obligations of such person or creditors for raw materials, inventory, services and supplies incurred in the Ordinary Course of Business), (vi) the principal portion of payment obligations of such Person under any lease of property that must be accounted for as a capitalized lease, (vii) all payment obligations of others secured by any Lien on property or assets owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (viii) all obligations of such Person under interest rate or currency hedging transactions (valued at the termination value thereof), (ix) all drafts drawn and outstanding under letters of credit issued for the account of such Person and (x) all guarantees and arrangements having the economic effect of a guarantee by such Person of any indebtedness of any other Person.

"Indemnifying Party" has the meaning set forth in Section 6.4(b).

"Indemnitee" has the meaning set forth in Section 6.4(b).

"Items of Objection" has the meaning set forth in Section 1.6(b).

"Law" has the meaning set forth in Section 3.4.

"Lien" means any lien (statutory or otherwise), security interest, mortgage, pledge or other similar encumbrance.

"Management Agreement" means that certain Management and Monitoring Services Agreement dated April 30, 2007, by and between AC Corp and the Company.

"Management Fee Certificate" has the meaning set forth in Section 2.2(h).

"Necessary Third Party Approvals" means all consents, waivers, approvals, filings, registrations, declarations, notices, licenses, permits, orders and authorizations listed or required to be listed on **Schedule 4.3**.

"Notice of Objection" has the meaning set forth in Section 1.6(b).

"Ongoing Capital Leases " has the meaning set forth in Section 1.4(c)(i).

"Ordinary Course of Business" means the Company's ordinary course of business, consistent with past practice.

"Organizational Documents" has the meaning set forth in Section 5.1.

"Other Company Fees and Expenses" means amounts for (a) all legal fees and other professional fees owed by the Company as of the Closing Date, excluding any such fees related to the transactions contemplated hereby, and (b) legal fees and other expenses reimbursable by the Company to the Seller or its Affiliates (other than the Company), excluding any fees and expenses related to the transactions contemplated hereby and not included in the Accrued Management Fee.

"Person" means and includes a natural person, a corporation, an association, a partnership, a limited liability company, a trust, a joint venture, an unincorporated organization, a business, any other legal entity, and any Governmental Authority.

"Post-Closing Period" has the meaning set forth in Section 5.7.

"Pre-Closing Period" has the meaning set forth in Section 5.7.

"Pre-Closing Tax Liability" means the amount of liabilities for state income Taxes of the Company for all taxable periods ending in the calendar year 2009 and on or before the Closing Date.

"Prime Rate" means, as of any date specified in this Agreement, the U.S. prime rate published in *The Wall Street Journal*.

"Pro Rata Percentage" means, with respect to each person, the percentage listed on **Schedule 1.2** next to the name of such person and labeled as such person's "Pro Rata Percentage", which is based on the following calculation: (a) the number of Company Units owned by such person immediately prior to the Effective Date, divided by (b) the aggregate number of Company Units outstanding immediately prior to the Effective Date.

25

"Redeemed Company Units" has the meaning set forth in Section 1.2.

"Resignation" has the meaning set forth in Section 5.3.

"Retained Records" has the meaning set forth in Section 5.5.

"Sales and Transfer Taxes" has the meaning set forth in Section 2.6.

"Securities Act" has the meaning set forth in Section 4.6.

"Seller" has the meaning set forth in the opening paragraph of this Agreement.

"Seller Indemnified Losses" has the meaning set forth in Section 6.3.

"Seller Indemnified Parties" has the meaning set forth in Section 6.3.

"Seller Payments" has the meaning set forth in Section 1.7(a).

"Seller's Knowledge" means the actual knowledge of Craig Hille, Lee Lesley and Mark Raterman.

"Straddle Period" has the meaning set forth in Section 5.6.

"Subordinated Debt Documents" means that certain Amended and Restated Subordinated Loan Agreement, dated as of June 29, 2007, among the Company, as the borrower, and Allied, as the initial lender, and such other documents as were entered into in connection with such Amended and Restated Subordinated Loan Agreement.

"Subordinated Debt Pay-Off Certificate" has the meaning set forth in Section 2.2(g).

"Subordinated Indebtedness" means the outstanding principal amount, interest, prepayment penalty and other amounts owed by the Company to Allied pursuant to the Subordinated Debt Documents, and all other Indebtedness owed by the Company to Allied or AGILE Fund I, LLC or any of their Affiliates.

"Tax" refers to any and all federal, state, provincial, local and foreign taxes, assessments and other governmental charges, duties, impositions, social security contributions and Liabilities relating to taxes, including, without limitation, taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and real and personal property taxes, or any substitutes therefore, together with all interest, penalties and additions imposed with respect to such amounts.

"Tax Return" means any return, declaration, certification, schedule, report, claim for refund, or information return or statement filed (or required to be filed) in connection with any Tax.

"Termination Agreement" has the meaning set forth in Section 5.2.

"Transaction Documents" has the meaning set forth in Section 1.5.

"True-Up Cash Deficit" has the meaning set forth in Section 1.6(c)(iii).

"True-Up Cash Excess" has the meaning set forth in Section 1.6(c)(iii).

"True-Up Pre-Closing Tax Deficit" has the meaning set forth in Section 1.6(c)(iv).

"True-Up Pre-Closing Tax Excess" has the meaning set forth in Section 1.6(c)(iv).

"True-Up Working Capital Deficit" means the amount, if any, by which the Actual Working Capital is less than the Estimated Working Capital.

"True-Up Working Capital Excess" means the amount, if any, by which the Actual Working Capital is more than the Estimated Working Capital.

"Trusts" has the meaning set forth in the opening paragraph of this Agreement.

"Veltman" has the meaning set forth in the opening paragraph of this Agreement.

"Working Capital" means (a) the sum of the Company's total current assets of the types set forth below (excluding Cash and deferred tax assets), minus (b) the sum of the Company's total current liabilities of the types set forth below (excluding the current portion of deferred tax liabilities, accrued interest, accrued state income taxes, Indebtedness and all amounts paid or to be paid by the Company pursuant to Section 1.4(c)), excluding, however, the sum of (y) fees and expenses payable to the Buyers, Mr. Mark Saur, Mr. Howard Veltman, Allied, Seller or any of their Affiliates, the costs of title insurance policies relating to the Real Property, and any other fees and expenses required to be made by the Company in connection with the transactions contemplated by the Transaction Documents, in each case attributable to the transactions contemplated by the Agreement and not otherwise incurred by the Company in the ordinary course of business prior to the Closing, and (z) any expenses attributable to the transactions contemplated by the Agreement, including, without limitation, expenses related to due diligence such as environmental testing, real property surveys or title insurance policies, and professional advisor fees, that would not be incurred by the Company in the ordinary course of business, in each case as of the close of business on the Closing Date, calculated in accordance with the Company's historical month end accounting practices and, to the extent not in conflict with such practices, GAAP. The specific monthly balance sheet accounts to be included in the calculation of Working Capital are as follows:

> Current Assets:
> Accts Rec – Trade
> Other Receivables
> Total Inventory
> Total Prepaids and Deposits
>
> Current Liabilities:
> Total Accounts Payable
> Total Accrued Liabilities (subject to the exclusions set forth above)

"Working Capital Threshold Amount" means Six Million Dollars ($6,000,000).

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

**THE COMPANY:**

OLD ORCHARD BRANDS LLC

By: _____
Mark Saur
Its President

**SELLER:**

OLD ORCHARD EQUITY CORP.

By: _____

Its: _____

**ALLIED:**

ALLIED CAPITAL CORPORATION

By: _____

Its: _____

**BUYERS:**

MARK R. SAUR TRUST
dated July 6, 1992, as amended

By: _____
Mark R. Saur
Its: Trustee

HILLSBORO ASSOCIATES, LLC

By: _____

Its: _____

APPLE VALLEY HOLDINGS, INC.

By _____
Mark R. Saur
Its: President

LISA M. SAUR
TRUST dated July 6, 1992, as amended

By: _____
Lisa M. Saur
Its: Trustee

_____
Howard Veltman

_____
Charlene Vredevelt

[CONTRIBUTION AND REDEMPTION AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

**THE COMPANY:**

OLD ORCHARD BRANDS LLC

By: _____
    Mark Saur
    Its President

**SELLER:**

OLD ORCHARD EQUITY CORP.

By: _____
    Daniel L. Russell, President

**ALLIED:**

ALLIED CAPITAL CORPORATION

By: _____
    Craig M. Hille, Principal

**BUYERS:**

| | |
|---|---|
| MARK R. SAUR TRUST<br>dated July 6, 1992, as amended | LISA M. SAUR<br>TRUST, dated July 6, 1992, as amended |

By: _____
    Mark R. Saur
    Its: Trustee

By: _____
    Lisa M. Saur
    Its: Trustee

HILLSBORO ASSOCIATES, LLC

By: _____

    Its: _____

_____
Howard Veltman

APPLE VALLEY HOLDINGS, INC.

By _____
    Mark R. Saur
    Its: President

_____
Charlene Vredevelt

[CONTRIBUTION AND REDEMPTION AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

**THE COMPANY:**

OLD ORCHARD BRANDS LLC

By: _____
      Mark Saur
      Its President

**SELLER:**

OLD ORCHARD EQUITY CORP.

By: _____

      Its: _____

**ALLIED:**

ALLIED CAPITAL CORPORATION

By: _____

      Its: _____

**BUYERS:**

MARK R. SAUR TRUST
   dated July 6, 1992, as amended

By: _____
      Mark R. Saur
      Its: Trustee

HILLSBORO ASSOCIATES, LLC

By:_____

      Its:_____

APPLE VALLEY HOLDINGS, INC.

By_____
      Mark R. Saur
      Its: President

LISA M. SAUR
   TRUST, dated July 6, 1992, as amended

By:_____
      Lisa M. Saur
      Its: Trustee

_____
Howard Veltman

_____
Charlene Vredevelt

[CONTRIBUTION AND REDEMPTION AGREEMENT]